# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:04CR543 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| JOHN R. OTTE, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion of the defendant John R. Otte (Otte) to suppress (Filing No. 21) and supplemental motion to suppress (Filing No. 32). Otte filed a brief (Filing No. 22) in support of his motion. The government filed a brief (Filing No. 33) in opposition to the motion to suppress. Otte is charged in the Indictment with possession of a firearm having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). In his motion to suppress, Otte seeks to suppress any statements he made to law enforcement in the early morning hours of October 21, 2004, after his detention and warrantless arrest.

On March 29, 2005, the court held an evidentiary hearing on Otte's motion. Omaha Police Department (OPD) Officer Dean C. Miller (Officer Miller) and OPD Officer John Martin (Officer Martin) testified during the hearing. The court received into evidence a Rights Advisory Form (Exhibit 1). The transcript of the hearing was filed on March 31, 2005 (TR.). **See** Filing No. 37. There was no post-hearing briefing.

## FINDINGS OF FACT

On September 25, 2004, Officer Miller[1] was involved in an investigation of a burglary at 1330 South 24th Street in Omaha, Douglas County, Nebraska (TR. 4). The resident reported the theft of property including a Winchester 12-gauge shotgun and two other firearms (TR. 4). Robert Scarpino (Scarpino), a suspect from the September 25 burglary, identified

---

[1] Officer Miller has been working for the NSP for about 12 years and is currently assigned to the investigations unit (TR. 3).

Troy Rickard (Rickard) as being involved in the removal of a safe containing the firearms from the 24th Street address into Rickard's dark-colored Chevrolet Blazer (TR. 4-5). Based on this information, Officer Miller informed other officers to watch for Rickard who was under investigation for the burglary (TR. 6-7).

On October 20, 2004, law enforcement received information that Rickard was staying in a particular room at an Econo Lodge hotel in southwest Omaha (TR. 10). At approximately 11:00 p.m., officers made contact with Otte and another person, Jette Gillette (Gillette) at the hotel room (TR. 11). The officers were informed Rickard and a female had previously been in that particular hotel room, but had left shortly before the officers arrived (TR. 12). The officers transported Otte and Gillette to OPD headquarters for interviews regarding the location of Rickard (TR. 11). However, neither Otte nor Gillette were placed under arrest at that time (TR. 13). At approximately 1:00 a.m. the next day, Rickard and his companion were arrested driving a stolen vehicle (TR. 13).

Officer Martin[2] interviewed Otte, Gillette and Rickard (TR. 14). Officer Martin interviewed Otte first to determine whether he (Otte) had any knowledge of Rickard's role in the earlier burglary or other criminal activity (TR. 15). At the time, Otte was not a suspect in the September 25, 2004 burglary (TR. 16). Otte was placed in an unlocked interview room, was not handcuffed and was told the reason for his presence was to obtain information about Rickard (TR. 25, 36). Otte did not ask for an attorney or to leave (TR. 25). Otte informed Officer Martin that he (Otte) had no knowledge of any criminal activity involving Rickard or Rickard's possession of firearms (TR. 16).

Next, Officer Martin, with the assistance of Sergeant Neumann, interviewed Gillette (TR. 16). Gillette told the officers Otte had been in possession of a shotgun and that she (Gillette) could show the officers where it was (TR. 16). Gillette stated the shotgun was kept under a love seat at Otte's aunt's residence in the area of 25th Avenue and Mason Street (TR. 17-18). The officers suspected it was the shotgun stolen from the 24th Street residence (TR. 17, 31). Gillette also told officers Rickard had been in possession of another firearm (TR. 16). At

---

[2]Officer Martin has been working for NSP for about 6 years and is also currently assigned to the investigations unit (TR. 9).

approximately 3:30 a.m. that morning, Officer Martin took Gillette to the area of 25th Avenue and Mason Street, where Gillette pointed out Otte's aunt's residence (TR. 17-18).

Officer Martin and Sergeant Neumann next interviewed Rickard to develop information about his role in the burglary and the location of the stolen firearms (TR. 18). Rickard stated a shotgun had been stolen in the burglary and had been sold to Otte for $200 (TR. 18). Rickard stated he also sold a black .40 caliber handgun, another firearm from the burglary, to Otte (TR. 19).

At approximately 6:00 a.m., Officer Martin and other officers went to Otte's aunt's residence to locate the shotgun (TR. 19). Cindi Petersen (Petersen), Otte's aunt, granted the officers permission to search the residence (TR. 20). Petersen confirmed she was Otte's aunt and Otte had stored a shotgun at her residence (TR. 20). Petersen showed the officers where the shotgun was located under a love seat (TR. 21). The shotgun found at Petersen's was the same shotgun reported stolen on September 25, 2004, from the 24th Street residence (TR. 25).

After recovery of the shotgun, Officer Martin returned to OPD headquarters to interview Otte (TR. 21-22). At the beginning of the interview, at 7:46 a.m., Officer Martin advised Otte of his rights pursuant to *Miranda* by using an OPD Rights Advisory Form (TR. 22; Exhibit 1). Officer Martin filled out the rights advisory form including Otte's responses to each of the questions posed (TR. 22-23). After Otte agreed to answer questions without an attorney present, he denied having had possession of the shotgun stolen during the 24th Street burglary (TR. 23). However, after being confronted with the shotgun and how the officer's obtained it, Otte admitted he had placed it at Petersen's and stated he "just wanted to get rid of it" (TR. 24).

## ANALYSIS

The defendant argues both statements he made to law enforcement on in the early morning hours of October 21, 2004 should be suppressed as fruit of his unlawful detention. Additionally, the defendant contends the statements were made involuntarily due to the length and circumstances of the detention and because the defendant was not *Mirandized*. The

3

defendant does not seek to suppress the evidence located at Petersen's residence. Accordingly, the court must resolve two issues. First, was the defendant subject to an unlawful detention. Second, were the defendant's statements made voluntarily.

## A.      Detention

Encounters between the police and citizens fall into three general categories:

(1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, **see, e.g., *Florida v. Bostick***, 501 U.S. 429 (1991); ***Florida v. Royer***, 460 U.S. 491 (1983); ***United States v. Tarantola***, 332 F.3d 498, 499 (8th Cir. 2003); ***United States v. Jones***, 269 F.3d 919, 925-26 (8th Cir. 2001); ***United States v. Hathcock***, 103 F.3d 715, 718-19 (8th Cir. 1997); ***United States v. Robinson***, 984 F.2d 911, 913 (8th Cir. 1993);

(2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, **see, e.g., *United States v. Sokolow***, 490 U.S. 1 (1989); ***Reid v. Georgia***, 448 U.S. 438 (1980); ***Terry v. Ohio***, 392 U.S. 1 (1968); ***United States v. Maltais***, 403 F.3d 550, 554 (8th Cir. 2005); ***United States v. Bustos-Torres,*** 396 F.3d 935, 942 (8th Cir. 2005); and

(3) physical arrests, which must be supported by probable cause. ***U.S. Const. amend. IV.***

The issue is whether the initial contact between law enforcement and the defendant was a purely consensual encounter or an investigatory detention or seizure. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." ***Terry***, 392 U.S. at 19 n.16. A seizure does not occur when a police officer approaches an individual and merely questions him or asks to examine his identification -- so long as the officer does not convey a message that compliance with his request is required. ***Bostick***, 501 U.S. at 434. If "a reasonable person would feel free 'to disregard the police and go about his business,'" the encounter is consensual and no reasonable suspicion is required. ***Id.*** (**quoting *California v. Hodari D.***, 499 U.S. 621, 628 (1991)). "It is well established that law

enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . [and] putting questions to him if the person is willing to listen." *United States v. Green*, 52 F.3d 194, 198 (8th Cir. 1995) (citations omitted).  A request for information does not turn consensual questioning into an investigatory stop. *United States v. Pena-Saiz*, 161 F.3d 1175, 1177 (8th Cir. 1998); *United States v. Poitier*, 818 F.2d 679, 682-83 (8th Cir. 1987).  Further, as long as a defendant was not selected for an approach for any purely discriminatory reasons, e.g., race or ethnicity, the fact law enforcement chose to approach a particular defendant is without constitutional implication.

The government has the burden to prove the initial encounter was voluntary, or that justification otherwise existed for each increasingly intrusive restraint on the defendant.  **See** *Missouri v. Seibert*, 124 S. Ct. 2601, 2608 n.1 (2004); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004) ("The government bears the burden of showing consent was freely and voluntary given and not a result of duress or coercion, and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority.").  "The determination of which police-citizen contacts fall within the regulation of the Fourth Amendment and which do not is a fact intensive one which turns upon the unique facts of each case." *Jones*, 269 F.3d at 925.

In this case, law enforcement first made contact with the defendant on October 20, 2004, at 11:00 p.m., during the search for a burglary suspect, namely Rickard.  The officers focused on the defendant only because he was in the hotel room occupied by Rickard. Based only on this information, officers transported the defendant to OPD headquarters as a witness with possible information about Rickard's suspected illegal activities and whereabouts. There is no evidence to suggest that Otte requested the officers to provide transportation to Otte for the ride downtown.  The evidence only suggests Otte was taken downtown for questioning. At approximately 1:00 a.m., once the defendant arrived at OPD headquarters, law enforcement had already located Rickard, but still sought information linking Rickard to a burglary.  Officer Martin interviewed the defendant as a witness and questioned Otte about Rickard, but obtained no helpful information.  It was not until Officer Martin interviewed Gillette

that the officers suspected the defendant was involved either in the burglary or had the shotgun taken during the burglary.

The court has no further information about the initial contact between the defendant and law enforcement.  Because a determination about whether the initial contact was lawful "turns upon the unique facts of each case" and the court is without such facts in this case, the government has failed to meet its burden to show the encounter was consensual.  Further, while law enforcement may have had sufficient reasonable articulable suspicion of criminal activity to detain the defendant, the record lacks factual support for such detention.  Finally, the evidence is devoid of probable cause for the defendant's arrest until well after his sequestration by law enforcement.  Accordingly, the court must assume the defendant was illegally detained when he was taken from the hotel to police headquarters.

However, the government has shown sufficient facts of a reasonable articulable suspicion of criminal activity to detain the defendant after the officers interviewed Gillette.  Specifically, the defendant was found in a hotel room recently inhabited by Rickard, the burglary suspect, and Gillette stated she had seen the defendant with a weapon which matched the description of a weapon stolen during the burglary.  Accordingly, the defendant's investigatory detention began shortly after the officer's interview with Gillette.

The defendant argues that the length of the detention was unreasonable and exceeded the permissible scope of a *Terry* stop.  A detention may become a *de facto* arrest if it lasts for an unreasonably long time, but there is no rigid time limit on an investigatory detention.  *Maltais*, 403 F.3d at 556 (**citing *United States v. Sharpe***, 470 U.S. 675, 685 (1985)).  In determining whether a period of time is excessive, the court must consider the "law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."  *Sharpe*, 470 U.S. at 685; *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) (holding one-hour detention upon reasonable suspicion to wait for a drug dog was reasonable).

The time periods involved in this matter are not precise.  However, the defendant was located in the interview room from approximately 1:00 a.m. until his second interview at approximately 7:45 a.m., without any noteworthy law enforcement contact.  The court finds

reasonable suspicion to detain the defendant arose after the defendant's initial interview, but before 3:30 a.m. when Gillette showed the officers the residence where the shotgun was located.   The officers obtained probable cause for the defendant's arrest when they interviewed Rickard, who implicated the defendant, and determined the shotgun hidden by the defendant was the weapon stolen by Rickard in the recent burglary.   **See, e.g.,** *Flynn v. Brown*, 395 F.3d 842, 844 (8th Cir. 2005) ("Probable cause exists if the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense.").   The officers did not have an opportunity to interview Rickard until after they spoke to Gillette.   Additionally, the officers did not approach the residence where the shotgun was located until 6:00 a.m.   Therefore, the defendant was subject to an investigatory detention, at the longest, from approximately 3:00 a.m. until 6:00 a.m.   At 7:45 a.m., when the officers again made contact with the defendant, they had probable cause to arrest him.

The court finds the time period between 3:00 a.m. and 6:00 a.m. was not transformed from an investigatory detention into an arrest requiring probable cause. The officers were working diligently to determine whether the defendant had committed an offense relative to the stolen weapons.   The officers continued to conduct interviews related to the stolen weapons.  Further, it was reasonable for the officers to wait until 6:00 a.m. to approach the residence where the weapon was found.  Finally, the defendant, although detained, was left to himself without constant law enforcement interference and was not informed that he was under suspicion for any crime.

### B.   Exclusionary Rule

Because the defendant was subject to an illegal detention, the court must determine whether his subsequent statements should be excluded, on that basis alone. The exclusionary rule prohibits the admission of evidence unconstitutionally obtained.   *Weeks v. United States*, 232 U.S. 383 (1914).   The rule also applies to evidence, tangible and testimonial, which was derived, directly or indirectly, from the unconstitutionally obtained evidence, i.e., the "fruit of the poisonous tree."   *Wong Sun v. United States*, 371 U.S. 471, 487 (1963);

*Nardone v. United States*, 308 U.S. 338 (1939);   *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920); *United States v. Fellers*, 397 F.3d 1090, 1094 (8th Cir. 2005). Even though the exclusionary rule may require the exclusion of all evidence obtained by exploitation of an illegal search and seizure, the evidence may still be admissible into evidence if the evidence is gained by means sufficiently distinguishable to be purged of the primary taint of the illegality.  To that extent, three general exceptions have been carved from the exclusionary rule.  The first exception has been called the "attenuated connection" where the chain between the challenged evidence and the primary taint of illegality is so long or only linked by sophisticated argument that exclusion of the evidence is not warranted.  **See *Wong Sun***, 371 U.S. at 487-88; *Nardone*, 308 U.S. at 338.  The second exception has been called the "independent source" exception where evidence is admissible if the government can show it derived the evidence from a lawful source independent of the illegal conduct giving rise to the primary taint.  **See *Silverthorne Lumber Co.***, 251 U.S. at 385.  The third exception has been labeled the "inevitable discovery" doctrine where the government can establish that it would have inevitably discovered the challenged evidence without reference to the illegal conduct giving rise to the primary taint.  **See *Nix v. Williams***, 467 U.S. 431 (1984).

As stated by the Supreme Court in ***Brown v. Illinois***, 422 U.S. 590 (1975):

> Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains.  In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, ***Wong Sun*** requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint."  371 U.S. at 486, 83 S. Ct. at 416.  ***Wong Sun*** thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment.  If ***Miranda*** warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted.  **See *Davis v. Mississippi***, 394 U.S. 721, 726--727, 89 S. Ct. 1394, 1397, 22 L. Ed.2d 676 (1969).  Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the

knowledge [sic] that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings.  Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words."

*Id.* at 601-03.  The *Brown* court went on to identify four factors relevant to the determination of whether statements made to the police after an illegal seizure are admissible or sufficient to constitute voluntary consent:  1) whether the suspect has been advised of his *Miranda* rights prior to making the statements at issue;  2) the temporal proximity of the statements to the Fourth Amendment violation;  3) the existence of intervening causes between the violation and the statements; and 4) the purpose or flagrancy of the official misconduct.  *Id.* at 603-04.  Demonstrating a confession was "an act of free will [sufficient] to purge the primary taint of the unlawful invasion" is, of course, a function of circumstantial evidence, with the burden of persuasion on the state.  *Kaupp v. Texas*, 538 U.S. 626, 632-33 (2003) (**quoting** *Wong Sun*, 371 U.S. at 486).

The court finds that in applying the *Brown* factors, the government has not carried its burden to show that the defendant's initial statements were "'sufficiently an act of free will to purge the primary taint' [of the illegal detention]."  *Wong Sun,* 371 U.S. at 486.  The court finds the statements made by Otte during his initial interview at approximately 1:00 a.m. should be suppressed.  Because the court assumes the defendant was illegally detained; the statements were made without benefit of *Miranda* warnings; the statements were made shortly after the outset of the illegal detention; and there is no evidence of sufficient intervening cause to expunge the taint of the illegal detention the statements should not be used against the defendant at trial.

In contrast, the defendant's second statement, made after 7:45 a.m., was made after the defendant was advised of his *Miranda* rights.  **See** *Kaupp*, 538 U.S. at 633 (noting that although *Miranda* warnings are an important factor, they are, standing alone, insufficient for Fourth Amendment purposes, to break the causal connection between an illegality and the confession); *United States v. Hernandez-Hernandez*, 384 F.3d 562, 565 (8th Cir. 2004).

Additionally, while the defendant had been at the police headquarters he was left to himself, without law enforcement interference, for approximately seven hours, essentially overnight. **See *Taylor v. Alabama***, 457 U.S. 687, 691 (1982) (confession that followed illegal arrest by six hours was not sufficiently attenuated where suspect remained in police custody, was unrepresented by counsel, had been questioned on several occasions, fingerprinted, and subjected to a lineup); ***Brown***, 422 U.S. at 604-05 (confession that followed illegal arrest by two hours was not sufficiently attenuated where the arrest itself was a blatantly improper "expedition for evidence" and no intervening event of any significance occurred between the time of the arrest and the confession); **compare *Rawlings v. Kentucky***, 448 U.S. 98, 107-08 (1980) (the relatively nonthreatening, congenial atmosphere of a 45 minute detention that preceded a statement outweighed the illegal detention); ***Hernandez-Hernandez***, 384 F.3d at 565 (***Miranda*** warning effective when defendant stayed five days in jail, and subsequent questioning of different substance, location and with different officers than involved in initial illegal questioning); ***United States v. Edmondson***, 791 F.2d 1512, 1515-16 (11th Cir. 1986) (holding "confession, which began approximately forty-five minutes after his arrest, away from the scene of the arrest, made after twice being advised of his ***Miranda*** rights, and initiated by him was sufficiently attenuated."); ***United States v. Milian-Rodriguez***, 759 F.2d 1558, 1565 (11th Cir. 1985) (even assuming arguendo that initial arrest was the result of police misconduct, subsequent confession one hour later was not tainted by the arrest where police removed the suspect from the site of the arrest and administered ***Miranda*** warnings before the interview began). The officers involved in the questioning were not the same officers involved in the initial illegal detention. The defendant's initial detention and questioning were related to the information he may have about Rickard, not about his own criminal activity. When questioned the second time, the defendant maintained his denial of wrongdoing until confronted, not with police coercion or intimidation, but with the actual, legally obtained evidence against him. **See *United States v. Doby***, 598 F.2d 1137, 1141 (8th Cir. 1979) (noting "confession was not the fruit of an illegal search because it did not materially affect his decision to confess.") (citing cases). Finally, since the court must assume the initial detention was illegal, although the illegality is equally unsupported by the facts, the court does not find

10

it to be "flagrant" and the questioning occurred after the illegal detention had terminated. **See New York v. Harris**, 495 U.S. 14, (1990) (voluntary confession made during period of lawful detention after initial unlawful arrest). Neither the initial detention, nor the defendant's first statement explicitly contributed to the defendant's eventual confession. Accordingly, the court finds the defendant's later statements, at 7:45 a.m., were "'sufficiently an act of free will to purge the primary taint' [of the illegal detention]." Therefore, the court will recommend only the initial statements be suppressed. Upon consideration,

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

John R. Otte motion to suppress (Filing No. 21) and supplemental motion to suppress (Filing No. 32) be granted in part and denied in part. It is recommended the defendant's motion be granted with regard to the statements he made to officers during his first interview at approximately 1:00 a.m., but denied in all other respects.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 18th day of May, 2005.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge